Larry **KEESLING**, Vivian Keesling, **Heritage Land Company** a/k/a Heritage **Land Co.**, Appellants–Defendants,

v.

**T.E.K. PARTNERS, LLC,** Appellee–Plaintiff.

No. 18A02–0605–CV–411.

Court of Appeals of Indiana.

Feb. 28, 2007.

Charles R. Clark, M. Edward Krause III, Beasley & Gilkison LLP, Muncie, IN, James E. Carlberg, George T. Patton, Jr., Bryan H. Babb, Bose McKinney & Evans LLP, Indianapolis, IN, Attorneys for Appellants.

Donald K. McClellan, McClellan & McClellan, Muncie, IN, Paul L. Jefferson, Barnes & Thornburg, LLP, Indianapolis, IN, Attorneys for Appellee.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Larry Keesling and Vivian Keesling ("the Keeslings") and Heritage Land Company ("Heritage Land") appeal from the trial court's judgment following a bench trial in favor of T.E.K. Partners, L.L.C. ("T.E.K.") on T.E.K.'s complaint on a 1999 installment promissory note (the "original note") and to foreclose mortgages against the Keeslings, Heritage Land, Heritage/M.G., L.L.C. ("Heritage/M.G."), K.

Scott Green, Thomas McMullen, and M.G. Financial Services of Indiana, Inc. ("M.G. Financial"). The Keeslings and Heritage Land present two issues for our review, which we consolidate and restate as whether they are liable to T.E.K., the assignee of the original note, for sums advanced under a 2002 installment promissory note (the "second note") executed without their knowledge or consent. We hold that the second note was a material alteration of the original obligation such that the Keeslings and Heritage Land, as accommodation parties, are both discharged from further personal liability on the original note and are not liable for the additional sums advanced under the second note, which they did not sign.

We reverse and remand with instructions.

### FACTS AND PROCEDURAL HISTORY

In January 1998, Heritage Land and M.G. Financial formed Heritage/M.G. for the purpose of developing a residential neighborhood known as Ironwood Estates in Delaware County. On May 25, 1999, Heritage/M.G. executed the original note to Peoples Bank and Trust Company, custodian for the James Henke, I.R.A. ("Henke I.R.A."), in the amount of $300,000 to partially finance the development. The final installment under the note was due June 1, 2001. The signatories to the original note were Green, both personally and on behalf of Heritage/M.G. and M.G. Financial; McMullen, both personally and on behalf of Heritage/M.G. and M.G. Financial; Larry Keesling, both personally and on behalf of Heritage Land; and Vivian Keesling. The original note was secured in part by a mortgage from Heritage Land to the Henke I.R.A. on a thirty-six acre tract.[1]

Heritage/M.G. did not complete the payments under the original note by the June 2001 deadline. On January 3, 2002, the balance due on the note was $48,228.69. On February 1, 2002, without the Keeslings' knowledge or consent, R.M.G. Investment Group, L.L.C. ("R.M.G."), whose principals include Green and McMullen, purchased the original note from the Henke I.R.A. for $48,228.69, and the Henke I.R.A. assigned the original note and mortgage on the thirty-six acres to R.M.G.

Then, on May 24, 2002, R.M.G. assigned the original note and mortgage on the thirty-six acres back to the Henke I.R.A. In addition, without the knowledge or consent of the Keeslings or Heritage Land, Heritage/M.G. executed the second note to the Henke I.R.A. in the amount of $102,000. The second note provides in relevant part:

> This Installment Note is subject to a Mortgage, Instrument Number 1999–21019–2–3 recorded in Delaware County on 5/26/99 in the amount of $300,000.00.
>
> \* \* \*
>
> This note and all extensions or renewals hereof are secured by a mortgage interest in real estate in Delaware County, State of Indiana, per "Exhibit A and Exhibit B" dated May 26th, 1999, and executed in favor of the payee(s) hereof by Heritage/M.G., L.L.C.

Appellants' App. at 54. Green and McMullen personally guaranteed the sec-

---

1. The parties point out that an incorrect instrument number was used attributable to a mortgage on an adjacent ten-acre tract, but any error is not relevant to the issues on appeal.

ond note. No payments were ever made on the second note.[2]

Accordingly, on September 2, 2004, 1st National Bank and Trust Company, as Custodian for the Henke I.R.A., filed an amended complaint[3] for foreclosure of mortgages and judgment against the Keeslings, Heritage/M.G., Green, and McMullen. On October 25, 2004, the Henke I.R.A. assigned the mortgage and both the original note and the second note to T.E.K., and T.E.K. released Green and McMullen from any liability. On November 19, 2004, the trial court entered an order substituting T.E.K. for 1st National Bank as plaintiff. Following a bench trial, the trial court entered judgment for T.E.K. and against each of the defendants. The trial court concluded in relevant part that:

> 5. T.E.K. is entitled to judgment against Heritage Land Company's 36–acres of real estate and Heritage/M.G. LLC 10–acres of real estate, in rem, and against the Defendants, Heritage/M.G. LLC, Thomas McMullen, Larry Keesling and Vivian Keesling, jointly and severally, in personam, in the sum of $365,905.07 plus $10,000 in attorney fees, for a total judgment of $375,905.07.
>
> 6. T.E.K. is also entitled to a judgment against Heritage/M.G. LLC in the sum of $324,728.74.
>
> 7. T.E.K. is entitled to an Order foreclosing the May 26, 1999 mortgages upon both the 10 and 36 acres of real estate and foreclosing and barring all Defendant's equities of redemption and interest in the real estate.

Appellants' App. at 27. The Keeslings and Heritage Land bring this appeal.

---

## DISCUSSION AND DECISION

 The Keeslings and Heritage Land appeal from a judgment in which the trial court made special findings pursuant to Indiana Trial Rule 52(A). That rule provides in pertinent part that "on appeal of claims tried by the court without a jury ... the court on appeal shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A). When a trial court has entered specific findings and conclusions along with its judgment under Trial Rule 52, we apply a two-tiered standard of review. *MCS LaserTec, Inc. v. Kaminski,* 829 N.E.2d 29, 34 (Ind.Ct.App.2005). First, we consider whether the evidence supports the findings, construing the findings liberally in support of the judgment. *Id.* Findings are clearly erroneous only when a review of the record leaves us firmly convinced that a mistake has been made. *Id.* Next, we determine whether the findings support the judgment. *Id.* A judgment is clearly erroneous when the findings of fact and conclusions thereon do not support it, and we will disturb the judgment only when there is no evidence supporting the findings or the findings fail to support the judgment. *Id.* We do not reweigh the evidence, but only consider the evidence favorable to the trial court's judgment. *Id.*

 In sum, the Keeslings and Heritage Land contend that because they were accommodation parties on the original note, and the second note constitutes a material alteration of the original note, they are discharged from further personal liability under the original note, and they have no liability under the second note.

---

2. The parties also engaged in other transactions that are not relevant to the issues on appeal.

3. None of the parties to this appeal included the original complaint in an appendix.

In *S–Mart, Inc. v. Sweetwater Coffee Co., Ltd.*, 744 N.E.2d 580 (Ind.Ct.App.2001), we explained the law regarding guaranty contracts:

> A guaranty is defined as "a promise to answer for the debt, default, or miscarriage of another person." 38 Am.Jur.2d *Guaranty* § 1 (1999). It "is an agreement collateral to the debt itself" and represents a "conditional promise" whereby the guarantor promises to pay only if the principal debtor fails to pay. *Id.* Under Indiana law, three parties are required to execute a guaranty agreement: the obligor or principal debtor, the obligee or creditor, and the guarantor or surety....

\* \* \*

▇▇▇▇ The rules governing the interpretation and construction of contracts generally apply to the interpretation and construction of a guaranty contract. *The extent of a guarantor's liability is determined by the terms of his or her contract.* The terms of a guaranty should neither be so narrowly interpreted as to frustrate the obvious intent of the parties, nor so loosely interpreted as to relieve the guarantor of a liability fairly within its terms. The contract of a guarantor is to be construed based upon the intent of the parties, which is ascertained from the instrument itself read in light of the surrounding circumstances.

A guarantor's liability will not be extended by implication beyond the terms of his or her contract. *"A guarantor is a favorite in the law and is not bound beyond the strict terms of the engagement. Moreover, a guaranty of a particular debt does not extend to other indebtedness not within the manifest intention of the parties."*

Under Indiana common-law principles, when parties cause a material alteration of an underlying obligation without the consent of the guarantor, the guarantor is discharged from further liability whether the change is to his or her injury or benefit. In *Yin v. Society Nat'l Bank of Indiana*, 665 N.E.2d 58, 64 (Ind.Ct.App.1996), *trans. denied,* the court summarized the following rules relating to material alteration of a guaranty:

> "Guarantors and sureties are exonerated if the creditor by any act, done without their consent, alters the obligation of the principal in any respect or impairs or suspends the remedy for its enforcement." Moreover, *when the principal and obligee cause a material alteration of the underlying obligation without the consent of the guarantor, the guarantor is discharged from further liability.* A material alteration which will effect a discharge of the guarantor must be a change which alters the legal identity of the principal's contract, substantially increases the risk of loss to the guarantor, or places the guarantor in a different position. The change must be binding.

*Id.* at 585–86 (emphases added, some internal citations omitted).

Here, Heritage/M.G. is the principal obligor. The Keeslings are guarantors on the original note payable to the Henke I.R.A., which was the original obligee. As guarantors, the Keeslings are accommodation parties. *See* Ind.Code § 26–1–3.1–419 (defining accommodation party as someone who signs an instrument for the purpose of incurring liability on the instrument without being a direct beneficiary of the value given for the instrument).

▇▇▇▇ Heritage Land is also an accommodation party. Heritage Land

signed the original note as a maker but was not a direct beneficiary of the value given for the instrument. *See id.* Heritage Land pledged its real estate to secure the money advanced to Heritage/M.G. to develop another parcel titled in Heritage/M.G. in which Heritage Land had no interest. The nature of a party's signature must be based on the reason for which that signature was placed on the note. *Yin,* 665 N.E.2d at 63. The nature of the liabilities of an accommodation party is determined by the capacity in which he or she signed. *Id.* On these facts, Heritage Land, which received no value for its pledge, was not an ordinary maker but an accommodation party.

The Heritage Land mortgage provides in relevant part:

> This Mortgage is given to secure the payment of the indebtedness of Heritage Land Company to [Henke I.R.A.], as evidenced by a Promissory Note or Notes dated on the 25th day of May, 1999, in the amount of Three Hundred Thousand Dollars ($300,000.00), at an interest rate of Twelve Percent (12%) per annum, shall also secure the payment of any sums guaranteed by, advanced to or any obligation incurred by [Heritage Land] hereafter in favor of [Henke I.R.A.], .... It is understood by both parties that discretion to advance additional funds, as provided for above, remains with [Henke I.R.A.] and is not obligatory.
>
> [Henke I.R.A.] at his [sic] option, may extend the time of payment of any part or all of the indebtedness secured hereby, reduce the payments thereon, or accept a renewal note or notes therefore, without the consent of any junior lienholder and *without the consent of [Heritage Land] if [Heritage Land has] then parted with title to the mortgaged premises,* and no such extension, reduction or

renewal shall impair the lien or priority of this Mortgage, nor release, discharge or affect the personal liability of [Heritage Land] to [Henke I.R.A.].

Appellants' App. at 37 (emphasis added).

 The trial court concluded that the mortgage "provided that [the] Henke I.R.A. could advance additional funds[,] which it did, and such may be assignable and the assignments are enforceable." *Id.* at 26. But the mortgage is not a negotiable instrument. *See* Ind.Code § 26–1–3.1–104 (defining negotiable instrument as an unconditional promise or order to pay a fixed amount of money). The mortgage on the 36–acre tract, which secured the Keeslings' debt under the original note, did not constitute a promise to pay. The "discretion to advance additional funds" found in the mortgage did not authorize the Henke I.R.A. to obligate the Keeslings further without their knowledge or consent. And, as T.E.K. acknowledges, the mortgage expressly provides that Heritage Land's consent is required before T.E.K. may "extend the time of payment" or "accept a renewal note" unless Heritage Land has "parted with title to the mortgaged premises[.]" Appellants' App. at 37. Heritage Land remained in title, and no such consent was sought or given. Thus, the mortgage itself provides no grounds for holding either the Keeslings or Heritage Land liable for funds advanced under the second note.

 The trial court also concluded that the Keeslings had "fail[ed] to show that ... the May 29, 2004 assignment and release from the Henke I.R.A. to T.E.K. ... causes the Defendants to pay more than that party would have been obligated to pay." *Id.* at 26 (emphases omitted). Again, we cannot agree. Initially, we observe that the assignments back and forth between the Henke I.R.A. and R.M.G., and the final assignments from the Henke

I.R.A. to T.E.K. did not create any new rights or obligations.[4] As an assignee of the original note, T.E.K. acquired no further rights than the assignor had to convey. *See The Money Store Investment Corp. v. Summers*, 849 N.E.2d 544, 547 (Ind.2006) (stating assignee of mortgage takes no greater rights than assignor).

The original note was past due. Henke testified that the second note executed on February 1, 2002, merely memorialized the balance due on the original note, that "the previous note had expired so we were ... renewing an expired note and also confirming the balance due on the expired note." Appellee's App. at 40. Thus, T.E.K. maintains that the second note merely extended the time for payment of the original note, as authorized by that note, and did not constitute a material alteration of the original obligation. The trial court agreed, finding that the second note for $102,000 was merely given "to evidence the current amount of monies then due and owing" under the original note "and extend the due date for payment" of the original note. Appellants' App. At 25. Those findings are clearly erroneous.

Henke's testimony about his understanding of the operation and effect of the second note was part fact and part legal conclusion. The evidence shows that on February 1, 2002, R.M.G. purchased the original note from the Henke I.R.A. for $48,228.69. About four months later, on May 24, 2002, Greene and McMullen, on behalf of Heritage/M.G., executed the second note for $102,000 payable to the Henke I.R.A. and, on behalf of R.M.G., assigned the Heritage/M.G. original note and the Heritage Land mortgage back to the Henke I.R.A. Henke admitted he had no actual knowledge of how the difference was spent, Tr. at 63, and there is no exhibit in the record accounting for the difference between the two notes. But McMullen, who signed both notes, testified that the "difference [between $48,228.69 and $102,000] was used to pay vendors[,]" as well as to pay "interest and stuff." Transcript at 137.

 The evidence clearly shows that the second note did not merely extend the time of payment on the "current amount of monies then due and owing" on the original note. Instead, the facts demonstrate that the second note included additional money to "pay the bills." Transcript at 137. The second note purported to add Heritage/M.G.'s accounts payable to the original note. These payables were obligations of Heritage/M.G. for which the individual members of the LLC were not personally liable. *See* Ind.Code § 23–18–3–3 (a member of a limited liability company is not personally liable for the debts, obligations, or liabilities of the limited liability company).

The second note also capitalized interest due on the original note, that is, it converted interest due on the original note to principal in the second note. *See Black's Law Dictionary* 202 (7th ed.1999) (defining capitalization as the act or process of capitalizing or converting something into capital). The capitalization of interest meant that the contract interest rate of 12% and the default interest rate of 24% would be charged against the interest added to the second note, thereby compounding the payment of interest and the effective interest rate. In itself, this capitalization of interest was a material alteration.

4. The Keeslings and Heritage Land note that the assignments to and from the Henke I.R.A. and R.M.G. did not properly identify the Heritage Land mortgage, but any such error does not affect the issues on appeal.

Thus, the second note not only added new debt but increased the total principal draws beyond the $300,000 face amount of the original note. Henke testified that under the original note, his I.R.A. was committed to advance "up to $300,000" for the project. Transcript at 23, 27. The Henke I.R.A. advanced two $130,000 draws to Heritage/M.G. under the original note, for a total of $260,000. But the second note of $102,000 brought total draws to $362,000. While T.E.K. contends, and as we have noted, the trial court found, that the second note merely reflected the "current amount of monies then due and owing" under the original note, the total amount advanced under the two notes was $362,000 ($130,000 + $130,000 + $102,000), which was $62,000 more in draws than the original note authorized.

McMullen testified that "we had a cap of $300[,000] ... we had paid down to $48[,000]" and Henke "allowed us to take it back up under the terms of the old agreement" to $102,000. Transcript at 138. But the original note was a draw note with a $300,000 limit, not a revolving line of credit. *See Black's Law Dictionary* 374 (7th ed.1999) (defining revolving credit as an arrangement that allows the borrower to secure loans on a continuing basis as long as the outstanding balance does not exceed a specified limit). There is nothing in the four corners of the original note to support McMullen's statement that "under the terms of the old agreement" the principal balance could be "taken back up" as long as the principal balance did not exceed the $300,000 "cap" at any given time.

■ We agree with the trial court's conclusion that the documents in this case suffer from "poor draftsmanship." Appellants' App. at 26. But a guarantor is a favorite in the law, and he is not bound beyond the strict terms of his engagement. *Goeke v. Merchants Nat'l Bank & Trust*

*Co.*, 467 N.E.2d 760, 769 (Ind.Ct.App. 1984). Any ambiguities in a contract are to be construed against the party who employed the language and prepared the contract. *Id.* Moreover, a guaranty of a particular debt does not extend to other indebtedness not within the manifest intention of the parties. *Id.* at 765. Here, notwithstanding the confusing documentation, the original note was an unambiguous "promise to pay ... the sum of $300,000." The note contains a promise to pay a sum certain and does not provide for total draws greater than that sum. The original note was not a revolving line of credit. The accommodation parties assumed the risk of a $300,000 loan, not some multiple of $300,000.

■ As we have already noted, the capitalization of interest was a material alteration. And the inclusion of vendor payables and the capitalization of interest resulted in a third draw which, when added to previous draws, exceeded the face amount of the original note, another material alteration. All of these purported alterations occurred without the knowledge or consent of the Keeslings or Heritage Land. On these facts, the attempt to treat the second note as if it were one and the same as the original note must fail. And the second note was not a novation of the original note because there was no agreement of all of the parties to a new contract. *See Sullivan Builders & Design, Inc. v. Home Lumber of New Haven, Inc.*, 834 N.E.2d 129, 137 (Ind.Ct.App.2005) (noting that a required element of novation is the agreement of all parties to a new contract). Thus, the Keeslings and Heritage Land are not chargeable with the second note, a new agreement which did not include their signatures.

In sum, the second note constitutes a material alteration of the original obligation. As such, the Keeslings and Heri-

tage Land are discharged from their personal liability on the original note, and they have no liability for the additional sums advanced under the second note, which they did not sign. *See Yin*, 665 N.E.2d at 64. We reverse the trial court's judgment and remand with instructions to enter an in rem judgment against Heritage Land's thirty-six acre tract in the amount of $48,229.69, plus interest and a pro rata share of attorney's fees.

Reversed and remanded with instructions.

FRIEDLANDER, J., and DARDEN, J., concur.